## ANDERSON, Adm'r, et al. vs. MILLS, Ex'x.

VENDOR AND VENDEE: *Tender of deed before suit brought, etc.*
　　Before the vendor can bring an action at law for the payment of the purchase money for lands, he must tender a deed in accordance with the covenants of his title bond and demand payment, but, in equity, the rule should not be applied with the same strictness as at law, and where it appears that the vendor, pending the suit, made tender of the deed in court, and the objection for the first time is made in this court that no deed was tendered before suit brought, such objection will not be cause for reversal of the decree or an order of dismissal.

CONTRACTS: *Purchase of slaves, when considered executed.*
　　Where slaves were sold, possession and bill of sale given, and the vendor took a mortgage back to secure the payment of the purchase money, and before payment, they were emancipated by the civil war: *Held*, that the contract was executed; that the mortgage was but a security for the debt, and the security being destroyed did not extinguish the debt.

APPEAL from *Phillips* Circuit Court.
*Adams & Dixon,* for appellants.
*Tappan & Harner* and *A. H. Garland,* for appellee.

ENGLISH, Sp. J.    This was a bill to enforce a vendor's lien upon lands for the payment of the purchase money, etc.

The original bill was filed in the Phillips circuit court, in April, 1866, by John F. Mills, the vendor, who died before the final decree, and Caledonia R. Mills, the appellee, his executrix and sole legatee, was substituted as plaintiff.    Patrick H. Anderson and Jesse H. Anderson were the vendees; the former, the administrator, and the heirs at law of the latter, and Paul F. Anderson, Rees Davis, and Samuel K. Davis, occupants of the lands, were made defendants to the original bill; and B. J. Turner, an incumbrancer, was brought in by an amendment to the bill.    At the time the bill was filed and when the decree was rendered and an appeal taken by the defendants, Rufus K. Anderson was the administrator of Jesse H. Anderson, one of the vendees, but after the appeal was taken, he was succeeded in the administration by Paulding F. Anderson, who was substituted as an appellant in this court.

From the original bill and amendment, a cross-bill filed by the administrator and heirs of Jesse H. Anderson, the answers, exhibits, etc., on which the cause was heard below, the following material facts appear :

On the 4th of February, 1859, John F. Mills sold to Patrick H. and Jesse H. Anderson, a plantation in Phillips county, containing 1,306 acres; sixty-five slaves, and the horses, mules, hogs, sheep, cattle, grain, etc., household and kitchen furniture, etc., then on the place, for $105,000.    The lands were valued at $40,000, the slaves at $54,000, and the other personal property at $11,000.    The Andersons paid Mills at the time of the sale, $10,000 in cash on the lands, and $20,000 in

two drafts on the slaves and other personal property, leaving on the former a balance of $30,000, and on the latter $45,000, making $75,000 to be paid in the future. For this sum they executed to Mills six notes for $12,500 each, payable annually and bearing eight per cent. interest. In each note was included one-sixth of the balance due on the lands, being $5,000, and one-sixth of the balance due on the slaves and other personal property, being $7,500, making $12,500.

Mills executed to the Andersons, on the day of sale, a bond for title to the lands in the penal sum of $80,000. In the condition of the bond was recited the sale of the lands at $40,000, the payment of $10,000 in cash, the execution of the six notes for the remainder, which are described, and stating that in the notes were included the deferred payments on the slaves and other personal property; the bond to be void, if upon payment of each and all of said notes, when the same should become due and payable according to their tenor and effect, Mills should make to the Andersons a good and sufficient deed for said lands with covenants of warranty, etc.

Mills also executed to the Andersons, on the day of sale, a bill of sale for the slaves and other personal property, in which he covenanted that the negroes were slaves for life, and that he had a good right to sell and convey the same.

On the same day the Andersons executed to Mills a mortgage upon the slaves, reciting the purchase of the lands, slaves, etc., the execution of two drafts and six notes for the purchase money, conditioned to be void if they should pay the drafts and notes at maturity, etc.

The Andersons took and retained possession of the lands, slaves and other property sold them by Mills. The drafts were paid. The note payable 4th of February, 1860, and the note payable 4th of February, 1861, were also paid. There was a payment made on the note which fell due on the 4th of

February, 1862, and for the balance, $3,000, Jesse H. Anderson substituted a new note, due at twelve months, bearing the same interest as the original note.   This note and the three remaining notes, payable the 4th of February, 1863, 4th of February, 1864, and 4th of February, 1865, were wholly unpaid when the original bill was filed.

On the 11th of February, 1860, Patrick H. Anderson sold and conveyed his interest in the lands to Jesse H. Anderson. Part of the consideration of this sale was, that Jesse H. Anderson was to pay the notes given to him and Patrick H. Anderson for the purchase money of the lands, slaves, etc., to Mills.

On the 7th of August, 1865, Jesse H. Anderson conveyed all his interest in the lands purchased of Mills with other property, to B. J. Turner, in trust, for the benefit of his creditors.   He afterwards died.

The slaves were emancipated, and the bill prayed a foreclosure of the lien of Mills on the lands for the payment of the notes remaining unpaid.

The final decree was rendered at the November term, 1871. The court found that there was due on the unpaid notes, $81,550, of which sum, $31,069.70, was a mortgage and lien on the lands, and rendered a decree against Rufus D. Anderson, as administrator of Jesse H. Anderson, deceased, for the entire sum found due, and directed a sale of the lands by a commissioner, for the satisfaction of $31,069.70, declared to be a lien upon them, if not paid by a day named, and the balance of proceeds, if any, be paid over to Turner, as trustee, etc.

1. It is insisted for appellants that the decree should be reversed and the bill dismissed, because Mills did not tender to the vendors, as their legal representatives, a deed for the lands before he filed the bill.

The bill does not aver that any tender of a deed was made. In the cross-bill of appellants, they alleged that Mills had never exhibited to them any title in himself to the lands, nor tendered them any deed, though, as they insisted, the whole of the purchase money for the land had been paid; and they submitted that he be required to produce his title papers, and show his ability to make title; and they prayed a specific performance of the contract of sale, if he had title, and if not, a rescission, etc.

In the answer to the cross-bill, Mills admits that he had made no formal tender of a deed, but avers that the vendees and their representatives very well understood that he was able and willing to make them a title to the lands, on payment of the notes, which they had neglected and refused to pay; and he offered to bring into court a deed for the lands in accordance with his bond for title, and afterward, during the progress of the cause on the motion of the appellants that he be required to do so, he exhibited his title papers and tendered in court a deed for the lands, executed by himself and wife.

The failure to tender the deed before suit was not, in any form, made matter of defense in the court below; but the objection is made for the first time in this court — at least the record fails to show that the objection was made below as matter of defense.  But after the adoption of the present constitution, and before the final decree, the appellants moved the court below to dismiss the bill, because of the clause of the constitution prohibiting the courts from taking jurisdiction of slave contracts, and the learned counsel for the appellants gravely insists, that though this motion to dismiss was based solely upon the ground stated, yet the court should have dismissed the bill, for the reason that Mills had admitted, in his answer to the cross-bill, that he had not tendered the deed be-

fore suit, which might have been orally assigned as an additional ground for the dismissal of the bill.

It is very well settled in this state, that where the vendor, in his bond for title, covenants to make the vendee a deed on payment of the purchase money, he must tender the deed and demand the payment of the purchase money, before he can bring an action at law for it. In other words, that he must put the vendee in default before he subjects him to the costs of litigation. And this is a good rule of practice in the courts of law where the costs of a suit follow the judgment.

In *Wakefield v. Johnson, Adm'r,* 26 Ark., 506, and in *Welch v. Hicks,* 27 id., 294, this rule was held to apply to suits in equity, where the vendor files a bill to enforce his lien upon land for the payment of the purchase money. But in *McGehee v. Blackwell et al., ante,* 27, Mr. Justice SEARLE, in a well considered opinion, reviewed this question, and very properly held that, in equity, where the costs are under the control of the court, and may be awarded at its discretion, the rule should not be applied with the same strictness as in the courts of law.

Here, if, upon the filing of the bill, the appellants had brought the balance of purchase money justly due the plaintiff below into court, the court could have required him to make the deed and take the money, and taxed him with the costs of suit or dismissed the bill at his costs, upon his failure or inability to make the title. But though the suit was pending in the court below for over five years, and appellants sought rescission of the contract of sale or specific performance upon cross-bill, they did not interpose, as a matter of defense, in any form, the failure of the plaintiff to tender them a deed before suit, but have raised the objection for the first time in this court. We shall therefore decline to reverse the decree and order a dismissal of the bill for this cause.

2. Conceding it to be law, that where the vendor, who has executed to the vendee a bond for title, covenanting to make him a good and sufficient deed, on the payment of the purchase money, a court of equity will not compel a vendee to part with his money, where it is made to appear that the vendor cannot make title (*Lewis v. Davis et al.*, 21 Ark., 255 ; *McDermott v. Cabel et al.*, 23 id., 200). Yet the appellants failed in this case, in their answer or cross-bill, to allege any particular or specific defect in the title of Mills to the lands in question. Indeed they do not aver, even in general terms, that he had not or could not make a good title to the lands.

In the cross-bill they say that he had never exhibited to them any title in himself to any of the lands specified in his bond for title. And they ask that he be required to exhibit in court, his title to the lands, and to show whether the same had been properly recorded; and that if he had not a full and unincumbered title, he be required to procure the same and produce it in court. That if he had title and it had not been recorded, he state and show why it had not been recorded. They admit that the vendees and persons holding under them had been in undisturbed possession of the lands from the date of the contract of sale, etc. They insist that the title to part of the slaves was in the wife of Mills, and that the others were his property when emancipated, and that the loss fell upon him; and applying the payments made upon the slaves to the lands, they were overpaid for. And they pray that if his title to the lands turn out to be good, he be required to make title, and if not, that the contract of sale be rescinded, and the purchase money paid be decreed to them, etc.

In his answer to the cross-bill, Mills states that he purchased all of the lands except one tract, which was patented to him by the United States, of Pillow and wife, which they con-

182    SUPREME COURT OF ARKANSAS,

Anderson, Adm'r, et al. vs. Mills, Ex'x.

veyed to him, and the deed was duly recorded, etc., and he produced the deed and patent in court. That his title to the whole of the lands was good, and had never been questioned. That he and his vendees, the Andersons, and persons holding under them, had been in uninterrupted possession of the lands for at least twenty years, etc.

In the absence of allegations on the part of the appellants, pointing out specific defects in his title, this showing was sufficient. *Walker et al. v. Town's Ex'r*, 23 Ark., 147 ; *Bolton v. Branch*, 22 id., 435.

3. It is insisted for the appellants that the contract of sale of the slaves was executory ; that the execution of the bill of sale by Mills to the Andersons, and the taking of the mortgage back to secure the payment of the purchase money, were but parts of one entire contract; that Mills, in effect, was to remain the owner of the slaves until they were paid for; and the payment not being completed when they were emancipated, the loss fell on Mills.

An executory contract is one that is to be executed or carried into effect in the future.

Mills sold the slaves to the Andersons, made them a bill of sale absolute and unconditional on its face, and delivered the slaves to them, and they continued in their possession. There remained nothing more for him to do; the contract on his part was completed. There was no provision in the contract that the property was to be delivered at some future time, or that the title was to vest in the Andersons on the payment of the purchase money, or the happening of any future event. The contract on the part of Mills, so far as the slaves were concerned, was executed at the time it was made. As to the lands, he was to do something in the future — he was to execute the deed on the payment of the purchase money. As to the slaves, he was to do nothing in the future. The Ander-

sons gave their notes to Mills for part of the purchase money of the slaves. By these notes they contracted to do something in the future — to pay Mills the installments of purchase money, at the times stipulated. They also gave a mortgage on the slaves, to secure the payment of the notes. In the mortgage they conveyed the notes back to Mills, but the conveyance was to be void on the doing of something by them in the future — and that was the payment of the notes. Whatever was to be done in the future was to be done by the Andersons, and, as above observed, there remained nothing to be done by Mills to complete the contract.

The mortgage was but a security for the debt, and part of it remained unpaid when the slaves were emancipated. The security was thereby swept away, but the debt was not extinguished.

The appellants admitted in their pleadings that the Andersons were in possession of the slaves from the time of the purchase until the close of the war, in the early part of 1865, except such of them as had in the meantime died, run off to the federals, or been impressed into the military service.

There was a civil war from which resulted political measures emancipating the slaves. Had they all been swept away by an epidemic, the effect upon the contract of the Andersons to pay for them would have been the same. Though mortgaged for the debt, they had the right of redemption, and, in equity, are to be regarded as the owners of the slaves, and the loss by emancipation fell upon them — just as it would have done had they died. *Haskill, Adm'r, v. Sevier, Adm'r, et al.*, 25 Ark., 156; *Taconay v. Denton*, 25 id., 626; *Sevier, Adm'r, et al. v. Haskill, Adm'r*, 26 id., 133; *Pillow v. Brown et al.*, id., 240; *Kaufman & Co. v. Barr*, id., 25; *White v. Hart*, 13 Wall., U. S., 646; *Osborn v. Nicholson et al.*, id., 654.

But the counsel for appellants put this point in another

form.   They say that the mortgage was a chattel mortgage;
that some of the notes for the purchase money had matured
before, and were unpaid when the slaves were emancipated,
and that on the default of the Andersons, the mortgagors, the
title of the slaves vested absolutely in Mills, the mortgagee,
and the loss by the subsequent emancipation fell on him.

No doubt upon the failure of the mortgagor to pay a debt
at maturity, secured by a chattel mortgage, the mortgagee has
the right to take possession of the property, or to bring an
action at law for its possession.   But the default of the mort-
gagor does not extinguish his right to redeem, nor can he by
his own default, throw the risk of the loss of the property on
the mortgagee.   True, if, after default, as well as before, the
property is destroyed, the security is gone, but the debt is not
thereby extinguished.   *Price v. State Bank*, 14 Ark., 50;
*Blackmore v. Byrnside*, 2 English, 505.

4. In their cross-bill, the appellants allege that Mills was
not the owner of thirty-eight of the slaves at the time he sold
them to the Andersons.   That they were the separate property
of Mrs. Mills, his wife, and so continued to the time of their
emancipation; and they claim that the value of these slaves
should be deducted from the price agreed to be paid for all of
the slaves.

In the support of the allegation that the thirty-eight slaves
were the separate property of Mrs. Mills, they aver that her
husband, John F. Mills, in October, 1860, procured her to
execute a bond to the Andersons, in the penal sum of $80,000,
reciting the purchase of the lands and slaves by them of her
husband, the execution of the notes for the purchase money,
and obligating herself to relinquish dower in the lands; and
also to relinquish all right, claim or demand she might have
in said property, sold by her husband, etc.

In his answer to the cross-bill, Mills positively denies that

his wife ever had or held, or claimed to have or hold, any title to any of the slaves sold by him to the Andersons; and avers that at the time of the sale they were all his property that he had a perfect title to them, and the right to sell and convey them. That the allegation in the cross-bill that thirty-eight of them were the separate property of his wife, at the time of the sale, was utterly untrue, and without foundation. That one of the negroes named Dick was given to him by Thomas Brandon, the father of his wife, in the year 1830; that the gift was to him and not to his wife; and the gift was made before there was any law in the state of Alabama, where they then resided, securing to the wife separate property in slaves, etc. That he held and claimed Dick as his own property for twenty-nine years before the sale to the Andersons, and Dick was the only one of the negroes that was a gift from his wife's father. He admits that Mrs. Mills executed the bond to the Andersons, made an exhibit to the cross-bill, but states that the bond was executed solely to gratify Jesse H. Anderson, and to quiet his apprehension as to the possibility of Mrs. Mills becoming entitled to dower in the lands in the event of her surviving him, and not because she asserted any claim to any of the negroes, and that the clause as to the negroes was added in the bond to gratify Anderson, and out of abundant caution; and that Mrs. Mills informed him a the time that she claimed no title to any of the negroes.

There was no evidence produced upon the hearing to disprove the denials of Mills, or to show that his wife really ever had or claimed separate title to any of the slaves.

The deed of trust executed by Mills to John M. Binford Aug. 10, 1866, does not purport on its face to have any relation to the slaves in controversy, and there was no evidence introduced to show that it did.

If any of the slaves were in fact given to Mrs. Mills by her

father, or distributed to her from his estate, or acquired by her from any other source, and secured to her as her separate property, so as to exclude the marital rights of her husband, there must have been some evidence of the fact more satisfactory than that produced by appellants. And Mills having executed to the Andersons a bill of sale for the slaves, warranting the title to be good, and they having received them into their possession, and remaining in possession of them until they were emancipted or died, it was incumbent on the appelants, as their representatives, not only to aver, but to prove a want of title in Mills against his denial, in order to avoid the payment of the purchase money. An affirmative allegation of the cross-bill, denied by the sworn answer of Mills, should have been proven by evidence equivalent to the oaths of two witnesses, or one with corroborating circumstances.

5. It is insisted for the appellants, that the court below erred in rendering a decree against the administrator of Jesse H. Anderson for the whole amount found to be due upon the unpaid notes. That the decree should have been rendered only for the $31,069.70 balance found due upon the lands, and that the appellee should have been remitted to the probate court, or the law side of the circuit court, to obtain an allowance or a judgment against the administator for so much of the amount due upon the notes as was for the purchase money of the slaves. In other words, that Mills, in the beginning, should have split up his demands, though embraced in the same notes, and filed his bill to enforce his lien upon the lands for the amount due upon them, and brought a suit in a court of law for the balance of the purchase money claimed to be due for the slaves. That the court of equity had no jurisdiction of the latter claim, though it had of the former.

It must be borne in mind, that in the bond executed

by Mills to the Andersons, to make them a deed for the lands, the notes given for both the lands and the slaves were recited, and he covenanted to make title to the lands upon the full payment of each and all of the notes. Under this covenant, it might have been insisted with some force, that he was not bound to make a deed for the lands until the whole amount due upon the notes was paid. And in his original bill he prayed a decree for the whole sum, and a sale of the lands to satisfy the decree if not paid. The court below put a different construction upon the contract, and gave his executrix a decree charging the lands and ordering a sale of them for so much as was found to be due on them only. From this decree the executrix did not appeal, and we are not called upon to decide whether, in this respect, it was right or wrong. But the court of chancery, having rightfully obtained jurisdiction of the subject matter of the suit, had the power to dispose of the whole case and terminate litigation between the parties, as it did, so far as it could do.

It is doubtless a misfortune for persons who bought slaves upon credit, and lost them by emancipation, to have to pay for them. But it is now very well settled that the loss falls upon the purchaser and owner and not upon the seller. The covenant in a bill of sale, warranting the title good, and negroes to be slaves for life, was not broken by emancipation, brought about by a civil war, and a resulting change in the constitution. The warrantor is no more bound for the loss of the slaves by such emancipation than if they had been destroyed by a flood or an earthquake. See cases before cited.

The decree of the court below must be affirmed, and the time fixed for the sale of the lands having passed, a mandate must be sent to the court, directing it to renew the order of sale, that the decree may be executed.

McCLURE, C. J., and BENNETT, J., dissenting.

STEPHENSON, J., being disqualified, did not sit in this case.